Case No. 25-7005 Stabil LLC et al. v. Russian Federation et bal. Case No. 25-7064 GSC DTEC Crimin Ergo v. Russian Federation et bal. Mr. Perlov v. Russian Federation et bal. Ms. Cheek v. Empoli GSC DTEC Crimin Ergo. Mr. Boykin v. Empoli Stabil LLC et al. Good morning, Council. Good morning. Good morning, Your Honors. Juan Perlov, Curtis Malay for the appellant, the Russian Federation. I have reserved seven minutes of my time for rebuttal, and may it please the Court. The Foreign Sovereign Immunities Act conditions a court's subject matter jurisdiction on satisfying an exception to sovereign immunity. The only exception that could possibly apply here is the arbitration exception. And under that exception, as this Court has repeatedly made clear, courts must independently satisfy themselves of the existence of a validly formed arbitration agreement with or for the benefit of the parties. At its core, these appeals present a basic question of contract law. Has a valid agreement been formed where the party purporting to accept an offer is not the party or a member of the class to whom the offer was directed? And we all learned in first-year contracts class that the answer to that question— Does it matter whether the offer is just directed or can impact that other party? It has to be directed to the other party. The terms of the offer have to be plainly directed so that the person who purports to accept it has the power to accept it. And that is because the offeror is the master of the offer, and only the terms of the offer can dictate who has the power to accept it. We cited several cases in our briefs that make this basic point. A letter containing an offer addressed to a specific person cannot be accepted by their roommate, even though they live at the same address. A person who works for Walmart in Mississippi cannot accept an offer of employment benefits made to Walmart employees who work in Illinois. So why doesn't this not just go to the scope as opposed to the existence of the arbitration agreement under Hawley and Zhongshan? Scope is one of those terms that gets tossed around a little bit in the cases. But it's not a question of scope in a vacuum. There are scope issues as to an agreement that already exists and what falls within it. But there's also, as Sebille aptly pointed out in their brief, the concept of scope of an offer. But you agree that there is an arbitration agreement. There's a treaty and there's an arbitration term in it. And this is just whether these Ukrainian companies fall within the scope of it. No, there is no agreement, certainly not between the parties. And the arbitration clause in the ECT has to be looked at for its terms to see who has the power to accept the offer that is in it. The court in Nextera made very clear that, and I'd like to read from the language of Nextera. But if Russia never intended to extend an offer to arbitrate to the parties like yourself, how could the agreement even exist in the first place such that 1605 would apply? Well, the fact that there is a arbitration clause in the investment treaty goes to the fact that it's there. But it doesn't necessarily end the inquiry. You still have to look at the terms of the actual provision to see who was it directed at. Who are the members of the class that have the power to accept it? In cases outside this circuit, for example, in the Fifth Circuit, you have the Al-Walid case in which the plaintiffs came in waving around an arbitration agreement and saying, we've satisfied our obligation under the arbitration exception to have jurisdiction. And the Fifth Circuit said, no, that arbitration agreement that exists is not between the parties to the action. It's not for the benefit of the parties to the action as a result. So there, the Circuit said there is no jurisdiction under the arbitration exception because there is no relevant agreement that exists between the parties. And that's what we have here. We have a situation where the petitioners have come into the tribunal, into this court, waving around an arbitration clause, saying we have the power to invoke that clause. But the problem is that based on what this court held in Nexterra, when we look at the language of the treaty, we find that they are not the parties or the class of – or members of a class that are – that have the power to accept it. And why is that? Because the arbitration clause says that you have to be an investor from a contracting party that made an investment in the territory of the other contracting party. That is the basic – So why isn't this case governed by Hulley? Because in Hulley, there was a similar argument where Russia argued that even if it did make a standing offer to arbitrate by signing the treaty, the shareholders are not proper beneficiaries of the arbitration clause. And that went to scope. And that just seems similar to what you're arguing here, that we do have an arbitration clause, we do have a treaty, but these Ukrainian companies don't fall within that, just like the shareholders in Hulley. This seems very similar to me. It's different because in Hulley, the claimants to the arbitration fell within the terms of the treaty. They were incorporated in – Hulley argued that there was a dispute about that, but that just goes to scope. And the same thing here. The Ukrainian companies say they fall within the scope of the treaty. You don't think so. It seems really similar to me. Again, because the term scope, it's not a term of art. It's not dispositive of whether it's a formation or a agreement that exists and what falls within it. The concept of scope can go to both formation in the sense of the scope of the offer, like in all the cases in contracts. I understand that, but I'm saying why isn't your argument governed by Hulley? Because Hulley has decided this. I understand you're making an argument that this doesn't go to scope, but how do you distinguish this case from Hulley? Because, again, a couple of reasons. One, in Hulley, the claimants already fit within the facial terms of the treaty, and they were trying to argue – Well, they disputed that. They being Russia? Yeah. Well, Russia made an argument that because the investors were ultimately controlled by Russian citizens, they weren't the kinds of investors who could get to the treaty. Isn't that very similar to your argument here, that because the Ukrainians at the time were investing in Ukraine and later became Russia? It just seems like a very similar kind of argument, like that you're disputing a fact that would make them not part of the treaty or not. So it's not exactly the same, but it's the same type of argument? It's the inverse. And the fact that it's the inverse, I think, matters. And that's putting aside the second part, which I'd like to get to, which is that there was no dispute in Hulley that those investors had invested in the territory of the other contracting party. So they were only looking at the fact of do you qualify as an investor based on your nationality, kind of like an exterra, right? So in this case, do you qualify as being part of this treaty because there was a change in, I guess, control? No, it's not a matter of do you qualify as an investor? It's a matter of are you the kind of person, a foreign investor, for whom the benefit or the benefit for whom the treaty was entered into? I guess it's a timing issue. Maybe you weren't a foreign investor at the time of the treaty's inception, but you were at the time of the expropriation. And that's the critical difference. But that goes to scope. It doesn't go to scope because it's more like the Hulley issue. And it's the first Hulley issue in terms of the provisional application of the treaty. Did the treaty apply during the provisional period? And the court in Hulley said that's an issue of formation. That's an issue of the existence of an agreement because you have to look at whether the terms of the agreement could even apply during the period in which the provisional period, the provisional application of the treaty was in effect. The claimants there were saying we are—they were contesting the fact. They were saying we are within the scope of the time period in which we can invoke the treaty because that's what Russia extended in the treaty. And Russia said, no, we have to ratify it under Russian law. We have to do certain things under Russian law. It would be inconsistent to submit to arbitration during that period. And the court here said, yeah, it sounds in scope, sure. But the court here said, no, that is a formation issue because it goes to the point of whether you have the power during that time period to invoke that provision. And here the question is did you invest in Russia as understood by the parties to the treaty? That's very different from the first issue in Hulley, though, because in Hulley, wasn't it that Russia hadn't ratified it, the wrong person signed it, who didn't have authority? That really goes to whether you even—you entered any kind of treaty, whereas this is more of a factual question about whether the investor falls within the treaty, which does exist, et cetera. It really more seems like the second issue in Hulley and not the first. Well, let me try to come at it a little bit differently, because if you have a situation where a Ukrainian investor, OK, were investing in France, were investing in Turkey and in Bulgaria, and they claim that some conduct by Russia affected or harmed their investment in those countries, it would be very plain to everyone. It would have nothing to do with this treaty. And that's what we have here. We have a situation where the Ukrainian investors invested in Ukraine at a time when the treaty was entered into. Ukraine was understood to be—Crimea was understood to be a part of Ukraine. But broadly speaking, though, this is a treaty that governs the relations between Russia and Ukraine, and Russia committed to protecting the interests of Ukrainian investors in Russian territory. And at the time of the expropriation, it expropriated assets of Ukrainian companies in Russian territory. So that's why your analogy seems really inaccurate. Well, no. Respectfully, I think it works, because Crimea is disputed territory. There is no mutual understanding between the sovereigns to the treaty. My understanding is that Russia did not dispute in the Dalek arbitration that it was in control of Crimea at the time of these expropriations. But Ukraine has never agreed to the understanding under the treaty that Crimea is Russian territory. You can look in our joint appendix. We have included several diplomatic notes that were exchanged between Russia, Ukraine. Nobody disputes, correct, that Russia was in control of Crimea at the relevant time of these expropriations. But that doesn't matter. It's not the control. It's the legal status of the territory. That's your position, but that goes to whether—that goes to the scope of the agreement. No, I don't think—again, it goes to the scope in the sense of an offer. Did the offer extend to investments made in disputed territory? Did the—which would be outside of the agreed-to territory among the sovereigns to the treaty as to what constitutes the territory of the other? And just like if a Ukrainian investor were to invest in France, were to invest in Bulgaria, they couldn't invoke this treaty to enter into an arbitration agreement with Russia. If a tribunal purported to render an award under that theory, this court would have an obligation to review the issue de novo and to come to a conclusion as to whether the Ukrainian investor in Bulgaria can invoke the treaty here simply because they're a Ukrainian investor. And that's what we have with respect to the issue in terms of the limitations on the territorial application of this treaty here. And I want to get back to reading from Nextera, the language that I think is critical here. It's page 1102. We recognize that a sovereign's consent to arbitration is important. That is especially so whereas here the agreement to arbitrate is the basis of a federal court's authority to exercise jurisdiction over the sovereign. And then it goes on to conclude in that paragraph. We therefore may look to the investment treaty itself to identify the scope of the sovereign's consent and the relevant agreement under the FSIA. And I see that I've gone into my rebuttal time, so I can complete that on rebuttal if appropriate. Thank you. Good morning, Your Honors. May it please the court. I'm Marnie Cheek, appearing on behalf of DTAC Criminergo. To avoid duplicative arguments, I will devote my time to the existence of the arbitration agreement. And Mr. Boykin, counsel for Stabo, will focus on the New York Convention. And to the extent that you have questions, also the personal jurisdiction issue. So these appeals arise from really a straightforward arbitral award enforcement action. The district court's decisions that denied Russia's motions to dismiss apply the well-established case law in this circuit regarding subject matter jurisdiction under the FSIA's arbitration exception. With regards to the jurisdictional fact of an arbitration agreement, it's interesting to note that the Russian Federation has not taken you to the language of the agreement to arbitrate itself, which is Article 9 of the Bilateral Investment Treaty. Counsel for Russia had been quoting NextEra, and I will as well, in that what you're looking for to the question of jurisdiction is whether a sovereign entered into an agreement to arbitrate for the benefit of a class of investors. And if you look at the language of Article 9 of the Ukraine-Russia Bilateral Investment Treaty, it states that any dispute between a contracting party and an investor of another contracting party arising in connection with investments will be referred to arbitration. That provision doesn't have any language regarding territory at the time the treaty was entered into. It has none of the limitations that Russia is trying to read into the arbitration agreement. It is exactly like NextEra. It is exactly like Hulley. It's exactly like numerous cases that have come before this court where the agreement is for the benefit of Ukrainian investors. That's what's on the face of the treaty. That class of investors are investors of Ukraine. You could read Article 9. It says in connection with the investments. So you could read Article 9 to say the investments imply the investments made at the time in the other territory. So I don't think that this fixes the problem. So that's a question that goes to scope. I agree with you, but what you just said is that this language takes care of it. I think you can read this language to say just to support Russia's argument that it says in connection with the investments and the investments implies the investments when made. And at that time, they were in Ukraine. So I just don't think the statutory language is as strong. So many investment treaties, for example, the U.S.-Ecuador Bilateral Investment Treaty that was at issue in Chevron also refers to the fact that there is an agreement to arbitrate with investors of the other contracting party with respect to an investment.  So I don't think that there's no ‑‑ if the word is they. I agree with you that this is a scope issue. I just think that the argument that the statutory language takes care of it is not convincing to me because it says the investments. So because it says the investments, I think you could read this to support Russia's argument that when it says the investments, it means the investments made at the time. And at the time, these were Ukrainian companies investing in Ukraine. So how do you find out what it means to say in connection with investments? You look at the definition of investment under the investment treaty. If you look at the definition of investment in Article 1.1, it says that it's, you know, any kind of tangible or intangible assets which are invested by an investor in the territory of the other contracting party. Territory also is defined in this treaty, Article 1.4, as the territory of the Russian Federation. There's no limiting language there that would address this issue of whether it doesn't say it's territory of the Russian Federation at the time this agreement was entered into. I think it's all goes to scope, but I just think it's arguable because at the time, the territory was not Russian. So I think the facts are that at the time that these investments were made, they weren't subject to this treaty, but they became subject to the treaty when Russia took over Crimea. And at that point, arbitral tribunals have determined that, yeah, it was subject to the treaty. And I think all of this goes to scope. So I kind of agree with you, but I don't think that these kind of factual and treaty-based arguments are kind of the answer because there's a timing issue. I think it's undisputed that at the time that the investments were made, they were not subject to the treaty, and that's Russia's point. But arbitrators have found that they are ultimately subject to the treaty, and I think it's a scope issue. So I agree that we agree that it does go to scope, and that's the fundamental issue. It does not go to the jurisdictional question of whether there is an arbitration agreement here. And so I think your analysis really can stop based on that assessment. I would note also that there's tension in Russia's position. I think they're grabbing onto this phrase in next era, like class of investors. But that is, again, not an issue that goes to whether this arbitration agreement exists for the benefit of Ukrainian investors. That's not a jurisdictional fact that is being resolved here. As you mentioned, it goes to scope. So Russia's position is that if DTEK and Stabil as Ukrainian investors had made an investment in Siberia, that there would be an arbitration agreement here that benefits these Ukrainian investors. But because Stabil and DTEK made their investment in Crimea, then there is no arbitration agreement here that has been entered into on behalf of these investors. There's just nothing that those arguments just do not go to whether or not there is an existing arbitration agreement. They do not go to, you know, questions that were raised in Kholi about whether, you know, the agreement was valid and entered into. They don't go to questions like in Belize over whether a government official could properly bind the state of Russia. Those are questions that go to the validity and existence of the arbitration agreement, and none of those types of questions are before you here. You will recall that, you know, in Chevron, there was an argument made by Ecuador that the investments weren't part of the agreement to arbitrate and weren't covered by the standing offered arbitrate. But again, this court found that that was an issue related to scope, arbitrability, not an issue related to whether an agreement exists. So the district court in both of these cases really got it right, and that they found that Russia's arguments are conflating arbitrability with whether or not there is an agreement to benefit Ukrainian investors here. But under this circuit's clear precedent in NextEra, in Chevron, all of Russia's arguments don't go to the existence of an arbitration agreement. They simply go to whether these specific disputes can be arbitrated. And that's a question for another day. So with that, I will, unless there are further questions about the arbitration agreement, I will have Mr. Boykin come to the podium. Thank you. Good morning. May it please the court. My name is James Boykin of Hughes, Hubbard & Reed on behalf of the Stabile Appellees. This appeal concerns the applicability of the arbitration exception to sovereign immunity under the Foreign Sovereign Immunities Act. And to trigger the applicability of that exception, this court has held a petitioner seeking to confirm an arbitration award has to establish three jurisdictional facts. Ms. Cheek has already discussed arbitration agreement and how we establish that, and that the dispute concerns scope. I would only add to what she said something particular from the Stabile case, which is a reference to the reference in the joint appendix is page 350. It's a paragraph from the decision of the Swiss Federal Supreme Court dated October 16, 2018, in which the Swiss Federal Supreme Court wrote in paragraph 4.3.2, quote, the appellant, Russian Federation, does not deny before the Federal Supreme Court that territories that are de facto controlled by a contracting state are also included in the territorial scope of the 1998 Investment Protection Agreement. But the main argument that I'm here, as Ms. Cheek said, I would make. Does that mean that Russia in that arbitration proceeding agreed that there was an arbitration agreement with the investor? Like the opposite position was taken before us? At that point in time, before the Swiss Federal Supreme Court, that's what the court found, that the Russian Federation did not deny that de facto control by a contracting state also included in the territorial scope of the bid, that the bid's definition of territory included areas under its de facto control within its scope. So this just simply emphasizes, well, it makes two points, that your analysis about scope is the critical issue, but it also raises a stopple point that over there, they didn't dispute that it was within the territorial scope. They have come here today solely for purposes of. But you didn't make an estoppel argument either before us or before the district courts. Not below. You didn't rely on that. No, because we found the law so clear on that this was scope, we didn't feel the need to make an estoppel point. It was just simply sitting here listening today that I was reminded of that paragraph and thought I would draw your attention to it. Thank you. So the third jurisdictional fact that we had to establish was that there is a treaty, quote, potentially governing a ward enforcement. Now, the words potentially governing are important. They come from this court's decision in Next Era v. Spain, and they're derived from the text of the FSAA's arbitration exception, which grants subject matter jurisdiction over an action to confirm an award made pursuant to an agreement to arbitrate that is or may be governed by a treaty or other international agreement enforced for the United States, calling for the recognition and enforcement of arbitral awards. Now, in both briefs below, the Russian Federation has said that the treaty must require enforcement, but that's not what this court's jurisprudence said and that's not what the statute requires. We just need to show that there is a treaty that potentially governs enforcement, and we have done that when we pointed to the list to the New York Convention. And this court's jurisprudence is replete with cases in which awards in favor of claimants against sovereign states have been considered to be recognized and enforced under the New York Convention. The answer that the Russians come up with is that this case is sui generis because it involves a political award. And I'm not sure exactly what that is, but I know that the awards in this case are not political awards. They are awards for – Can they be both commercial and political? No. If we look at the Russians' authorities, such as the restatement, it refers in the discussion of political awards to awards between sovereign states. Oh, I see. So an example of a political award might be arbitral awards rendered under the Arbitration Commission established by the Treaty of Washington in 1871 that resolved the dispute between Great Britain and the United States about Great Britain's liability for actions it took during the American Civil War. Those would be political awards. This and the Swiss Federal Supreme Court also considered this argument and found that it was plainly a commercial award. It has to be either commercial or political. There are no other choices? Well, in the Alabama arbitrations, the United States was awarded a sum of money. So you could look at that award of a sum of money as commercial, but the larger context in which it took place was resolving a political dispute. So that would make it a political award. I would say that bilateral investment treaties – Of the treaty? Is there any other category besides political or commercial? This concept of political awards comes from – Because there could be an award between private parties that's not commercial. It could be, I don't know, defamation. I'm just saying that that's related to our other cases. So I guess there are other types of awards that are neither political nor commercial. But in this case, the question is just whether it's commercial. There may be. And it wasn't for us to define the contours, the outer contours of what is a political award. It would, again, I think go to scope because to the extent that the tribunals, in either case below, may have transgressed over the line into issuing a decision on a political question, which we vigorously dispute they did. They didn't. I mean, didn't they specifically say we have no comment about – That's exactly what they said. All they're saying is it's undisputed that Russia controls these territories. That's all they relied on. That's exactly correct. And the Swiss Federal Supreme Court in the Seville case reviewed that and said absolutely they didn't transgress that line. But my point was simply going to be that even if there was a quantum of doubt that they might have, that constitutes a defense under the New York Convention, that the arbitrators acted outside the assess of their authority. So in this sense, every question sort of goes back to scope. And it is not as if the Russian Federation won't have a chance to raise this argument before the district court, which it did not. So I don't see this aspect of the cases going to scope. I see Russia arguing that regardless of the scope, the New York Convention requires it to be about or related to commerce and or potentially related to commerce. And their argument is, which I don't agree with, but their argument is in their view this whole dispute turns upon a territorial determination because their position is at the time that the treaty was entered or at the time that these investments were made, it was all in Ukraine. And so to them, there had to be an implicit finding in the arbitration that this was no longer Ukraine. It had become Russia. And that's not a commercial question. But I think that that is kind of foreclosed by the fact that these are obviously commercial investments. These are companies investing to make profits, et cetera. It is sufficiently commercial to fall under the New York Convention. But I don't think that's a scope of arbitration issue. Okay. And I agree with you that these are obviously commercial awards because they were rendered under Article 9 of the bid, not Article 10. But I think that's their argument, yeah. And I would simply just go back to the extent there's – we only had to show – we think we've shown, as the district court held, that the New York Convention does apply. But all we had to do for purposes of the arbitration exception is show that it potentially applied, and we've more than satisfied that burden in both cases. With that respect, because the convention contemplates that the contracting states would have enforcement ability within any of those states, do we need to reach that agreement? I mean, reach that issue? No. Okay. For purposes of the immunity exception, you need only find that both petitioners – the petitioners have established their burden of production with respect to the three jurisdictional facts under the Chevron next-day jurisprudence. You don't need to get into the territory question at all. Okay. And I would conclude on that with respect – except with personal jurisdiction or – I think that we have to address this because I think Russia is saying that the treaty doesn't govern the award because it's not a commercial transaction. So we have to address that. Well, I think – Not even potentially. You can look – this was addressed by the court of – No, I'm just saying I think we, when we write our opinion, have to address this argument that this is not a part of – that the New York Convention doesn't govern this award because, according to Russia, it's not potentially a commercial transaction. We have to address that. If you feel that way and have to address it, I'd refer you to JA 370, and this is from paragraph 4.2 of the 2019 decision of the Swiss Federal Supreme Court in which they addressed this very issue about whether it was a commercial decision. And they say, contrary to what the appellant appears to be presuming, the matter in dispute in the arbitration was not the status of Crimea in relation to the 1988 bilateral investment treaty or its status under international law. But rather, the claim brought forward by the appellant for compensation in an amount of USD 47 million plus interest as a consequence of the alleged expropriation of their investments. So that at the court of the seat of the arbitration, this issue was raised that this was a political award or an award governing the status of Crimea. Swiss Federal Supreme Court said no, it wasn't. So if you do feel you need to address it, there's factual support in the record for that proposition. But I would come back to just say— I think your time has expired. Okay. Oh, I'm minus 42. Then I will sit down, and unless the court wants to hear personal jurisdiction, we'll just rest on our briefs and add to the recent case, Deutsche Telekom v. India, which adopted the reasoning that you put forward in our briefs. And thank you for indulging me. Thank you. Thank you. You have your seven minutes. Thank you. So I'd like to begin with the text of the treaty, because I think that that is what Nextera says we should look at when we're trying to determine the consent of the sovereign to arbitrate. And, Judge Payne, I understand your view on whether it's scope or not, but I think you're right to have some doubt about the language in the treaty, because when we look at the treaty itself, the definition of investor of another contracting party, which is Article I, also refers to making investments on the territory of the other. Investments, contracting party, and territory, these are all essential ingredients in the terms of the offer, which establishes who may accept it. This idea that any Ukrainian investor can invoke this treaty no matter where they invested, it does not conform to how investment treaties work. The whole purpose of an investment treaty is to protect foreign investments. There are several diplomatic notes that we have included in the joint appendix, and I would point you to one in particular at JA248 and 249 of the DTAC joint appendix, which is a diplomatic note that the Russian Federation sent to Ukraine to try to come to a common understanding of what the status of Crimea was under the treaty. And Ukraine did not agree to the position that it had become Russian territory. Instead, it just opted to terminate the treaty. And when more evidence of this kind of mutual understanding that is required to amend the treaty in terms of its territorial scope is also evidenced by the series of other diplomatic notes that we've included between Russia and other countries like Canada, the UK, France, where Russia invited those countries to recognize that Crimea was part of Russia for purposes of their bilateral investment treaties, which would entitle investors of the other contracting party to protections in Crimea. And consistently, all those other nations rejected that invitation and said, we don't agree that you can unilaterally amend the territorial scope of the treaties, and we don't accept that Crimea is part of Russia. So these all seem to be arguments you could have made to the arbitral tribunals. Well, that's fine. But the only question before us is whether there was a treaty. Well, basically, whether there was an arbitral agreement. And it just seems to me that all your arguments go kind of to the merits of whether or not you should have to pay, etc. And that was all resolved in the arbitral tribunals. But we just have these jurisdiction, jurisdictional facts. And one is the existence of an arbitration agreement. And it exists. It's just whether or not you're just arguing about whether or not these particular Ukrainian companies fall within it. Well, a couple of points on that. First, it's just not the existence of an agreement. It has to be a relevant agreement. Just like in the Al-Walid case in the Fifth Circuit where the petitioners in that case came in with an agreement that was not between the parties. And the court said you have an award rendered against the defendant here purportedly under that agreement. But that's not an agreement that was validly existing between the parties there. And so they dismissed the action under the FSIA. The same thing happened in the first investment case also in the Fifth Circuit. It seems to me that this is really sort of a temporal issue. You're arguing that the treaty only applies to people who would have been covered at the time of the investment. Whereas there's also the argument to be made that what matters is the time of the expropriation. And you would agree that at the time of the expropriation, Russia was in control of Crimea, and it took assets of Ukrainian companies. Right? So the facts are the facts. And it's just a question about at what point in time we look at this. And that's a question for the arbitral tribunal. And then also it goes to the scope of whether or not the Ukrainians fall within the treaty. No, respectfully, Your Honor, it is not. But you agree that at the time of expropriation, Russia was in control of Crimea? Russia was in control de facto is what the tribunal determined. But that is not a question that disposes of the issue of whether the sovereigns that were party to the treaty had a mutual understanding of what their territorial boundaries were. If there was a dispute about what the territorial boundaries. Let's take the temporal part of this aside. Say is everything as we know it to be that Russia was in control of Crimea. If the Ukrainian companies invested at that time with Russia already in control, would that fall under the treaty? If there was a mutual understanding between Ukraine and Russia that Crimea is sovereign territory of Russia and the treaty was amended to correspond with that change, that external change. I'm asking you if Russia was in control of Crimea at the time of the investments and then the Ukrainians invested in Crimea, would that fall under the treaty? No, because it's disputed territory. Okay. Okay. And that's important because, again, you can't a petitioner can't come into court waiving any kind of agreement and say, I have an award rendered pursuant to that agreement. So what it says in the treaty is the investments of investors of either contracted party made on the territory of the other. So it's just on the territory of the other. It doesn't go into these very specific things that you think have to happen. And if Russia is controlling it, it's their territory. But that is a determination that would have to be made in a dispute between the sovereigns. The treaty includes Article 10, which allows for disputes between the state parties to the treaty over the application interpretation of the treaty. If there is a disagreement, which there is here between the sovereign states as to what the territory is, that would be an award for a state to state arbitration under Article 10. And that would clearly be a geopolitical determination in a resolution of a dispute, which is a boundary dispute. And that is what we're talking about here. We can't have a unilateral amendment or revision of the treaty by one party that does not recognize the applicability of the treaty at the time. So we don't believe that we have here a situation where the investors that invested in Crimea were considered to be members of the class, which has to be defined as a jurisdictional matter under Nextera by this court. This court has to define what is the class of investors that are covered. And if the class of investors does not include investors of Ukraine in disputed territory, there is no jurisdiction here. Thank you, Your Honors.
judges: Childs; Pan; Rogers